AMERICAN COMMERCE INSURANCE BROKERS, INC., Appellant,

v.

MINNESOTA MUTUAL FIRE & CASUALTY COMPANY, Respondent.

No. C9–95–499.

Court of Appeals of Minnesota.

Aug. 1, 1995.

Review Granted Oct. 19, 1995.

between Starkey and the insured tortfeasor, as alleged by the UM carrier.

Linda S. Jensen, Messerli & Kramer, P.A., Minneapolis, for appellant.

Jon A. Hanson, Margaret K. Ackerman, Hanson, Lulic & Krall, Minneapolis, for respondent.

Considered and decided by PARKER, P.J., and RANDALL and HARTEN, JJ.

## OPINION

PARKER, Judge.

Appellant American Commerce Insurance Brokers, Inc. (American Commerce), purchased business property insurance from respondent Minnesota Mutual Fire & Casualty Company (Minnesota Mutual). The policy insured against loss caused by employee dis-

honesty and defined an "occurrence" as including a "series of related acts." American Commerce submitted a claim for loss after discovering that an employee had stolen more than $192,000 over a 13–month period.

Minnesota Mutual tendered payment of the $10,000 coverage limit for a single occurrence. American Commerce commenced an action for breach of contract and violation of the Unfair Claims Practices Act. On cross-motions for summary judgment, the trial court entered partial judgment in favor of Minnesota Mutual. The court ordered payment for loss caused by two occurrences. American Commerce appeals. We reverse.

## FACTS

American Commerce is an insurance brokerage company engaged in the business of obtaining liability insurance coverage for owners and operators of taxicabs. American Commerce purchased business property insurance from Minnesota Mutual. The insurance policy provided coverage for loss of or damage to business property and provided optional coverage for loss caused by employee dishonesty. American Commerce purchased the optional coverage.

Relevant portions of the employee dishonesty provision of the insurance policy are as follows:

4. Employee Dishonesty

a. We will pay for direct loss of or damage to Business Personal Property, including money and securities, resulting from dishonest acts committed by any of your employees * * * with manifest intent to:

(1) Cause you to sustain loss or damage: and also

(2) Obtain financial benefit.

* * *

c. The most we will pay for loss or damage in any one occurrence is the Limit of Insurance for Employee Dishonesty shown in the Declarations.

d. All loss or damage:

(1) Caused by one or more persons; or

(2) Involving a single act or series of related acts;

Is considered one occurrence.

The coverage limit is $10,000 per occurrence. The phrase "series of related acts" is not defined in the policy.

American Commerce filed a claim for loss based on dishonesty by employee Christee Lee Hartse. Hartse was a bookkeeper at American Commerce. She performed general office duties and prepared payroll. She also prepared checks for signature by American Commerce officers, prepared bank deposit slips, and deposited funds received from customers. Her duties included the direct sale of insurance coverage to customers, many of whom made their premium payment in person at the American Commerce office. Customers paid by cash, check, or by cashier's check.

When customers purchased or renewed insurance coverage, Hartse was responsible for depositing the premium payment into American Commerce's general account. She was supposed to issue a check from the general account payable to the assigned insurance carrier. Between January 1991 and February 1992, Hartse failed to deposit several premium payments into the general account. Instead, she retained the money for her personal use.

On several occasions, Hartse issued a check from American Commerce payable to the assigned carrier. On other occasions, she simply retained the premium and did not pay the carrier. She wrongfully advised several customers that American Commerce would accept payment in cash only. On at least three occasions, Hartse instructed customers to leave blank the "payee" line on the check. She later wrote in her name as payee and cashed these checks for her personal use. Hartse's wrongful conversion of customers' premium payments involved approximately 155 payments by personal checks, cash, or cashier's checks, and totaled approximately $179,000.

Hartse also wrongfully converted funds directly from American Commerce. She issued herself several unauthorized payroll checks from the general account. Some check amounts coincided precisely with her

regular paycheck amount. In one month, she issued herself six paychecks. She issued herself other checks in varying amounts, usually divisible by ten. Hartse thus converted approximately $13,000 directly from American Commerce; she caused them to incur a total loss of more than $192,000.

American Commerce submitted a claim with Minnesota Mutual for the total amount of loss. Minnesota Mutual took the position that Hartse engaged in a series of related acts subject to the $10,000 single-occurrence coverage limit, and tendered only that amount. American Commerce commenced an action against Minnesota Mutual, alleging breach of contract and violation of the Unfair Claims Practices Act. The complaint describes the acts by Hartse as "multiple, unrelated acts of employee dishonesty."

The parties filed cross-motions for summary judgment. Minnesota Mutual changed its position in its summary judgment motion and argued that two separate occurrences had taken place, since Hartse utilized two methods of operation: (1) wrongful conversion of customer payments; and (2) wrongful conversion directly from American Commerce. American Commerce maintained that each of Hartse's defalcations constituted a separate and distinct act of dishonesty. The trial court denied Minnesota Mutual's motion to dismiss American Commerce's claim under the Minnesota Unfair Claims Practices Act. The court entered summary judgment in favor of Minnesota Mutual, ordering payment for two occurrences.

## ISSUES

**I.** Did the trial court err by ruling that the phrase "series of related acts" is unambiguous?

**II.** Did the trial court err by denying Minnesota Mutual's motion for summary judgment dismissal of American Commerce's claim under the Minnesota Unfair Claims Practices Act?

## DISCUSSION

### I. Series of Related Acts

On appeal from summary judgment, this court must examine the record to determine whether there are any genuine issues of material fact, and whether the trial court erred in applying the law. *National Family Ins. v. Bunton,* 509 N.W.2d 565, 567 (Minn.App.1993). The interpretation of an insurance policy involves a question of law subject to de novo review. *Id.* Whether language in an insurance policy is ambiguous also involves a question of law subject to de novo review. *Columbia Heights Motors v. Allstate Ins. Co.,* 275 N.W.2d 32, 34 (Minn. 1979).

The relevant facts in this case are undisputed. The trial court ruled as a matter of law that the insurance policy unambiguously defines a single occurrence to include "all loss or damage, caused by one or more persons, involving a series of related acts." In defining "series of related acts," the trial court divided the phrase into its individual components. The court defined "series" as a number of similar events that follow one another in time. The court defined "related" as "to have connection, relation, or reference." The court defined "act" as "to take action."

The court combined each component definition and defined the phrase "series of related acts" as

> a number of dishonest things done by an employee which follow one another in time and are connected to each other in some manner.

Relying on this definition, the court rejected the argument by American Commerce that Hartse engaged in separate and distinct acts of dishonesty. The trial court accepted without discussion the acknowledgment by Minnesota Mutual that two methods of embezzlement gave rise to two separate occurrences.

It is not the word "series" but the term "related acts" that, by its great generality, requires a further search for meaning: "Related" has been defined generally as "[b]eing connected; associated." *American Heritage Dictionary* 1523 (3rd ed. 1992). It also has been defined as "[s]tanding in relation; connected; allied; akin." *Black's Law Dictionary* 1288 (6th ed. 1990). Definitions of "related" depend upon the purpose for which

that term is used. In science, tables of taxonomy provide a hierarchical classification of the degree of natural relationship between organisms. *See American Heritage Dictionary* at 1840. Each species belongs to a genus, each genus belongs to a family, and so on through order, class, phylum, and kingdom, *id.* at 1841, as the specificity of the natural relationship gives way to the more general.

The term "related" also has many legal definitions. The law has established degrees of consanguinity, in which heirs may be related either by lineal or collateral consanguinity for purposes of intestate succession. *See* Minn.Stat. § 525.145 (1994). Goods are said to be related for trademark purposes if "used in conjunction with one another" or "associated together in some way in the minds of the consuming public." *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1352 (E.D.Penn.1972).

The criminal law provides various frameworks for determining whether acts are "related." The Minnesota Racketeer Influenced and Corrupt Organizations (RICO) statute defines "pattern of criminal activity" as acts that are "related to one another through a common scheme or plan or a shared criminal purpose." Minn.Stat. § 609.902, subd. 6(3)(i) (1994). For purposes of criminal sentencing, whether multiple intentional acts are part of a "course of conduct" requires consideration of time and place, as well as whether the acts were motivated by the desire to obtain a "single criminal objective." *State v. Hawkins,* 511 N.W.2d 9, 13 (Minn.1994).

There is no Minnesota decision that interprets the phrase "series of related acts" as used in a policy of fidelity insurance. Courts in other jurisdiction have interpreted that phase as used in various other types of coverage, such as malpractice insurance. *Compare Bay Cities Paving & Grading v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 21 Cal. Rptr.2d 691, 702, 855 P.2d 1263, 1274 (1993) (construing "related" as a term that encompasses both a logical connection between separate acts of negligence as well as a causal connection, whereby one act is the cause of another) *with Arizona Property & Casualty Ins. Guaranty Fund v. Helme,* 153 Ariz. 129, 134–35, 735 P.2d 451, 456–57 (1987) (construing "related" as a term that encompasses causally related acts, but not logically related acts).

The court in *Arizona Property* rejected a definition of "related" that would encompass a logical connection between negligent acts, because that definition would depend upon the "subjective mental process of the reviewer." *Id.* at 134, 735 P.2d at 456.

> Causal connection depends, to a much greater extent, on objective facts in the record. If we were compelled to equate 'related' with 'logically connected,' we would be compelled to find the policy provision ambiguous, and for that reason find in favor of the claimant.

*Id.* (citations omitted). That court concluded that the number of occurrences is determined by the number of acts "causally *related to each other* as well as to the final result." *Id.* at 136, 735 P.2d at 458 (emphasis original). In affirming summary judgment in favor of the insured, the court concluded that since there was no causal connection between each of the physician's negligent acts, the insured was not bound by the single-occurrence coverage limit. *Id.*

The California Supreme Court rejected the reasoning in *Arizona Property* when interpreting a malpractice insurance policy in which a single occurrence included a "series of related incidents, acts, or omissions." *Bay Cities Paving,* 21 Cal.Rptr.2d at 701, 855 P.2d at 1273. The court ruled that "related" is broad enough to encompass both logical as well as causal relationships between acts. *Id.* at 702, 855 P.2d at 1274. The supreme court reversed the conclusion of the court of appeals that the phrase is inherently ambiguous. *Id.* at 698, 855 P.2d at 1270.

> 'Related' is a commonly used word with a broad meaning that encompasses a myriad of relationships * * * 'related' can denote a causal connection as well as the 'notion of similarity.'

*Id.* at 699, 855 P.2d at 1271 (citation omitted).

The court qualified the extent to which acts may be classified as logically related to one another:

At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play.

*Id.* at 702, 855 P.2d at 1274 (quoting *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir.1989)). In reversing the appellate court, the California Supreme Court concluded that two errors by an attorney were related because each arose from the same transaction, damaged the same client, were committed by the same attorney, and resulted in the same injury. *Bay Cities Paving*, 21 Cal.Rptr.2d at 703, 855 P.2d at 1275. The court ruled that no objectively reasonable insured would expect coverage for more than one claim. *Id.* at 699, 855 P.2d at 1271.

The above cases illustrate two reasonable methods for interpreting the phrase "series of related acts," each of which leads to a different result. The trial court in the present case defined "related" as acts that are "connected to each other in some manner." This definition is broad enough to encompass acts that have a "logical connection" or a "notion of similarity." *Id.* at 702, 855 P.2d at 1274 (citation omitted). Adoption of this broad approach, however, overlooks the purpose for which the term was used in the cases developing both the logical and the causal connection analyses; malpractice insurance is written to cover acts of professional negligence, while employee dishonesty coverage involves *intentional* acts.

Determining the extent of coverage provided by employee dishonesty insurance thus requires an analysis that is distinguishable from that of insurance policies covering loss caused by professional negligence. The term "related" as used in malpractice insurance may be better adapted to the objective causality analysis because negligence involves foreseeability, which is determined according to an objective standard. It may be reasonably foreseeable that a single act of negligence will cause a myriad of consequences that bring about further acts of negligence in an attempt to remedy or conceal the initial act.

On the other hand, an insured may reasonably expect that employee dishonesty coverage will insure against each loss caused by an employee's intentional acts. The policy issued by Minnesota Mutual provides coverage where the employee acts with "manifest intent" to cause loss. At least one court suggests that the determination of whether a series of intentional acts are causally related may require inquiry into the employee's subjective intent. *Business Interiors, Inc. v. Aetna Casualty & Surety Co.*, 751 F.2d 361, 363 (10th Cir.1984).

■ We decline to interpret "series of related acts" as language that requires inquiry into whether the employee subjectively intended to engage in continued dishonest acts. Nor will this court arbitrarily assign a definition to the term "related" in order to conclude that a single coverage limit will or will not apply. Terms in an insurance policy must be given "their plain, ordinary, and popular meaning" and courts will not read ambiguity into a policy to find coverage. *Columbia Heights Motors*, 275 N.W.2d at 34 (citing *Ostendorf v. Arrow Ins. Co.*, 288 Minn. 491, 495, 182 N.W.2d 190, 192 (1970). However, the presence of alternative frameworks from which to analyze whether acts are "related" indicates that the language "series of related acts" is subject to more than one interpretation.

■ If language of an insurance policy is subject to more than one reasonable interpretation, there is ambiguity. *Id.* The change in positions taken by the parties throughout this litigation demonstrates that the phrase is certainly subject to more than one interpretation. American Commerce sued to obtain coverage for the entire loss, asserting that each act of theft was separate and distinct. In contrast, Minnesota Mutual answered that all acts of dishonesty were a series of related acts subject to the coverage limit for one single occurrence. Minnesota Mutual tendered payment only for loss caused by a single occurrence of dishonesty.

■ After discovery and upon filing of cross-motions for summary judgment, Minnesota Mutual changed its position and asserted that Hartse employed two distinct methods of operation. The trial court accepted this and ordered payment for two

occurrences, yet declined to decide whether a difference in modus operandi is enough to render a series of acts unrelated. On appeal, American Commerce contends that if modus operandi is determinative, Hartse utilized at least *seven* identifiable methods for wrongfully converting funds.[1]

Examination of the parties' several positions indicates that none is really unreasonable. If the employee's acts and modus operandi are analyzed according to a broad definition of "related," Minnesota Mutual has a reasonable argument that Hartse engaged in a series of related acts. She utilized her position as bookkeeper to wrongfully obtain the funds. She embezzled funds every month throughout a 13–month period. Each embezzlement followed (in varying degrees) closely in time. She initially received all funds during her work hours while at the premises of American Commerce. Furthermore, she utilized two general methods. She either (1) retained customer payments, or (2) embezzled directly from American Commerce.

On the other hand, if the employee's acts and modus operandi are analyzed with specificity, American Commerce has a reasonable argument that loss was caused by multiple occurrences of dishonesty. Hartse wrongfully instructed several customers that American Commerce would accept payment in cash only. She accepted this cash and simply retained it for her personal use. With other customers, Hartse accepted and retained premium payments made by check or cashier's check. In some instances she forwarded payment to the assigned carrier and in other instances she did not; in the latter cases, she appears to have victimized several parties.

Hartse also wrongfully instructed three customers to leave blank the payee line of the check. She later wrote her name on the payee line and cashed the check for her personal use. She also issued to herself unauthorized payroll checks directly from American Commerce's general account. In addition, she simply issued to herself several unauthorized checks in varying amounts. Her acts of embezzlement and theft occurred on different days throughout a 13–month period, and the number of such acts varied greatly from month to month. Her victims include American Commerce as well as the many customers who tendered payment for premiums in expectation of receiving insurance coverage. Each act produced a separate, identifiable loss, and she could have been found liable for damages caused by each discrete act.[2]

■ Whether to analyze Hartse's acts and methods of operation with specificity or generality requires an arbitrary decision, given the language of the policy, as to what degree of "relatedness" between the acts would be sufficient to constitute an "occurrence." The court could have had guidelines for interpreting the phrase "series of related acts" if Minnesota Mutual had defined that phrase or preceded the term "related" with an adjective, such as "causally" or "logically." We hold that the phrase "series of related acts" as written in this fidelity insurance policy is subject to more than one reasonable interpretation and therefore is ambiguous as a matter of law.

■ Ambiguous language will be strictly construed against the insurer and in favor of the insured. *Rusthoven v. Commercial Standard Ins. Co.*, 387 N.W.2d 642, 644–45 (Minn.1986). "The result of such a construction, however, must not be beyond the reasonable expectation of the insured." *Id.* at 645. Determination of the reasonable expectation of the insured involves a question of fact: "[t]he insured may show what actual expectations he or she had, but the factfinder should determine whether those expectations were reasonable under the circumstances."

---

1. We deny the motion by Minnesota Mutual to strike this argument as raised for the first time on appeal. This argument is not an alternative theory of recovery. *See Leonard v. Parrish*, 420 N.W.2d 629, 632 (Minn.App.1988). The number of occurrences and methods of operation were issues directly before the trial court.

2. If Hartse's acts were analyzed from the perspective of the criminal law, she seemingly could be charged with commission of several distinct intentional crimes, including various counts of theft, fraud, forgery, and obtaining signatures by false pretense. *See* Minn.Stat. §§ 609.52, subd. 2, 609.625, 609.63, 609.635 (1994).

*Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 278 (Minn.1985).

We reverse summary judgment entered in favor of Minnesota Mutual and remand to the district court for a determination of what would constitute the reasonable expectation of an insured in the circumstances presented by this case. Since this insured is an insurance brokerage, questions such as the cost of the optional coverage, the number of employees, and the nature of the business conducted by American Commerce would bear on this determination.

## II. Unfair Claims Practices Act

 American Commerce alleges in the complaint that Minnesota Mutual "failed to comply with its obligations" under the Minnesota Unfair Claims Practices Act. *See* Minn.Stat. § 72A.201 (1994). The trial court denied Minnesota Mutual's motion for summary judgment dismissal of this claim upon finding that the complaint does not allege a claim for damages under section 72A.201. Minnesota Mutual, by notice of review, challenges the trial court's denial of summary judgment on this issue.

Section 72A.201 authorizes the Commissioner of Commerce to impose administrative remedies for various unfair settlement practices. *Id.*, subds. 1, 4. The supreme court has explicitly ruled that the Unfair Claims Practices Act deals with administrative regulation of insurance practices, and does not create a private right of action against the insurer. *Morris v. American Family Mut. Ins. Co.*, 386 N.W.2d 233, 235 (Minn.1986); *see O'Reilly v. Allstate Ins. Co.*, 474 N.W.2d 221, 223–24 (Minn.App.1991) (holding that insured has no claim against insurer based on violations of the act).

American Commerce has not requested damages based on this claim, yet contends that proof of violation of the act would provide support for the underlying breach of contract claim. American Commerce does not attempt to demonstrate how proving noncompliance with the act is relevant to the breach of contract action. We reverse the denial of Minnesota Mutual's summary judgment motion with regard to American Commerce's claim under section 72A.201.

## DECISION

The phrase "series of related acts" is subject to more than one reasonable interpretation when determining whether an employee's dishonest acts are subject to a single occurrence coverage limit, and is, therefore, ambiguous. The ambiguous language must be construed in favor of the insured, and the doctrine of reasonable expectations must be applied. Summary judgment in favor of the insurer on the coverage issue is reversed and remanded to the district court for the factfinder to determine what would constitute reasonable expectations of such an insured. Since the insured has no claim under the Minnesota Unfair Claims Practices Act, we reverse the trial court's denial of the insurer's request for summary judgment on the claim under section 72A.201.

**Reversed and remanded.**